UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHERINE L. VARNUM,

                            Plaintiff,

            v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.
_____

<u>DECISION & ORDER</u>

15-CV-6269P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Katherine L. Varnum ("Varnum") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 6).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 10, 12).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Varnum's motion for judgment on the pleadings is denied.

**BACKGROUND**

## I.   Procedural Background

Varnum protectively filed for SSI/DIB on February 6, 2012, alleging disability beginning on January 31, 2011, due to a slipped disc in her back.  (Tr. 230, 234 ).[1]  On April 25, 2012, the Social Security Administration denied Varnum's claim for benefits, finding that she was not disabled.[2]  (Tr. 85-87).  Varnum requested and was granted a hearing before Administrative Law Judge Michael W. Devlin (the "ALJ").  (Tr. 27, 103-04, 120-24).  The ALJ conducted a hearing on July 23, 2012 in Rochester, New York.  (Tr. 27-65).  Varnum was represented at the hearing by her attorney Justin Goldstein, Esq.  (Tr. 27, 118).  In a decision dated November 25, 2013, the ALJ found that Varnum was not disabled and was not entitled to benefits.  (Tr. 7-26).

On March 11, 2015, the Appeals Council denied Varnum's request for review of the ALJ's decision.  (Tr. 1-4).  Varnum commenced this action on May 5, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

## II.   Relevant Medical Evidence[3]

### A.   Treatment Records

#### 1.   Steven D. Lasser, MD

Varnum began treatment with Steven D. Lasser ("Lasser"), MD, in February 2009 upon referral from the Clifton Springs Hospital after being treated there for complaints of progressively increasing lower back pain radiating to her right leg, accompanied by numbness

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Varnum's previous request for benefits was denied on February 20, 2010.  (Tr. 231).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

and tingling.  (Tr. 453).  Varnum reported that she had suffered from intermittent lower back and leg pain for the previous six years.  (*Id.*).  Varnum reported that she had been laid off from her previous employment and did not have insurance.  (*Id.*).  According to Varnum, her pain had become so intense that she had sought treatment from the emergency department and had been prescribed indomethacin and Flexeril.  (*Id.*).

Upon examination, Varnum's back was not tender to palpation.  (*Id.*).  She was able to flex forward eighty-five degrees, laterally to ten degrees, and extend to zero degrees.  (*Id.*).  A neurological examination demonstrated equal strength and reflexes in her extremities, and a straight leg raise was negative.  (*Id.*).  According to Lasser, Varnum's sensation was decreased over the right L5 and S1 dermatomes.  (*Id.*).  Imaging of the lumbar spine demonstrated some facet arthrosis at the L4-L5 and L5-S1 levels, with mild degenerative changes and a straightening of normal lordosis.  (*Id.*).

Lasser assessed that Varnum suffered from degenerative disc disease and right sciatica acute exacerbation.  (*Id.*).  He prescribed Dictofenac and Skelaxin, referred Varnum to physical therapy, and provided her with a lumbar support.  (*Id.*).

Varnum returned for treatment with Lasser on July 17, 2009.  (Tr. 454).  During the visit, Varnum complained that her right hip felt out of joint and that she was experiencing numbness and weakness in her right foot.  (*Id.*).  She was reportedly taking Naproxen and Glucosamine to address these symptoms.  (*Id.*).  Varnum reported that she had not worked since the previous November.  (*Id.*).

Upon examination, Varnum's back was not tender to palpation, and there were no visible deformities.  (*Id.*).  She was able to flex forward to sixty degrees and extend to about ten degrees.  (*Id.*).  A neurological examination demonstrated that her lower extremities were intact

with good strength, sensation, and reflexes. (*Id.*). A straight leg raise was mildly positive at ninety degrees while sitting. (*Id.*).

Lasser assessed two years of persistent mechanical lower back pain with right sciatica of an undetermined etiology. (*Id.*). He recommended an MRI scan of the lumbar spine and encouraged Varnum to remain as active as possible and to continue taking anti-inflammatory medicine. (*Id.*).

Varnum returned for an appointment with Lasser on September 11, 2009 to review the results of her MRI. (Tr. 455-56). According to Lasser, the MRI revealed diffuse degenerative changes with spondylosis throughout the lumbar spine with probable lateral recess stenosis at L4-L5 and L5-S1. (*Id.*). There were annular tears at each of the bottom three discs. (*Id.*).

Lasser referred Varnum for an electrodiagnostic study to be performed by Dr. Tolomeo and a myelogram and post-myelogram CT to assist in identifying areas of root compression and to better explain Varnum's right-sided symptoms. (*Id.*).

Varnum returned for an appointment with Lasser on December 18, 2009 to review the results of the myelogram and post-myelogram CT. (Tr. 457-61). According to Lasser, Varnum continued to complain of pain in her hip and groin, numbness in her thigh, and frequent episodes of leg dysfunction. (*Id.*). She also complained of intermittent gluteal pain and numbness in her hands and feet. (*Id.*). Varnum reported that physical therapy and medication had not alleviated her symptoms. (*Id.*).

According to Lasser, the imaging demonstrated normal-looking exiting nerve roots with no sign of any neurocompression or instability in her lumber spine. (*Id.*). He assessed that Varnum possibly suffered from sacroiliac joint dysfunction syndrome, right greater

4

trochanteric bursitis, possible piriformis syndrome with variable compression of the sciatic

nerve, meralgia parasthetica with variable compression of the right femoral cutaneous nerve and

possible component of fibromyalgia.  (*Id.*).  Lasser believed that further diagnosis was

warranted, but that spinal surgery would not address Varnum's complaints.  (*Id.*).  He referred

Varnum to Dr. James Inzerillo, a physical medicine and pain specialist.  (*Id.*).

<h3 align="center">2.    <u>Clifton Springs Hospital</u></h3>

Varnum presented to the emergency department at Clifton Springs Hospital on

February 7, 2010 complaining of pain from her neck to her feet.  (Tr. 296-302).  Varnum

reported ongoing pain for the previous ten years and numbness when sitting.  (*Id.*).  Varnum

reported that her pain was exacerbated by prolonged standing and was alleviated by lying down.

(*Id.*).  Varnum refused to take a muscle relaxer because she did not want to feel groggy.  (*Id.*).

She reported previous treatment with Dr. Lasser and that she had been referred to Dr. Inzerillo

for treatment.  (*Id.*).  Upon examination, the straight leg raise test was negative, and Varnum

demonstrated normal gait and ability to heel and toe walk.  (*Id.*).  Imaging of the thoracic spine

was normal, and imaging of the cervical spine demonstrated mild to moderate osteoarthritic

changes.  (*Id.*).  Hospital staff assessed degenerative joint disease of the cervical spine.  (*Id.*).

Varnum returned to the emergency department on February 18, 2010 complaining

of pain in her back and left hip and leg accompanied by numbness.  (Tr. 304-07).  Varnum

reported that the pain was not alleviated by ibuprofen.  (*Id.*).  According to Varnum, walking and

sitting exacerbated her pain.  (*Id.*).  Upon examination, hospital staff noted tenderness in

Varnum's thoracic spine and a negative straight leg raise test.  (*Id.*).  Varnum was able to flex to

fifty degrees with pain and extend to thirty degrees.  (*Id.*).  She did not demonstrate pain upon

palpation of the left hip. (*Id.*). She was assessed to suffer from low back pain and discharged

home with a prescription for Indocin. (*Id.*),

### 3.     James M. Inzerillo, MD

On March 4, 2010, Varnum attended an appointment with James M. Inzerillo

("Inzerillo"), MD. (Tr. 462-64). Varnum reported that she had been performing low back

stretches through squatting and on "all fours," which seemed to loosen up her back. (*Id.*). She

continued to experience low back and right buttock pain, which could be ten out of ten on a daily

basis. (*Id.*). She also complained of bilateral groin pain and numbness down her right leg. (*Id.*).

Varnum reported that she lived alone and that she had a cat and a dog. (*Id.*).

Inzerillo conducted a physical examination and assessed that most of her pain

appeared to stem from her lower lumbar and lumbosacral facets and her right sacroiliac joint.

(*Id.*). According to Inzerillo, although Varnum complained of pain radiating down her right leg

and demonstrated a greater decrease in pinprick sensation, the physical examination did not

produce any signs of radiculitis. (*Id.*). Inzerillo performed some manipulations of Varnum's

lumbar spine, which she tolerated well. (*Id.*). He instructed her to continue to do her stretches at

home followed by a cold pack to her lumbar spine and sacroiliac joint. (*Id.*).

Varnum returned for an appointment with Inzerillo on April 30, 2010.

(Tr. 334-36). Varnum continued to complain of significant pain while walking, although

Inzerillo found her complaints to be "somewhat vague and inconsistent." (*Id.*). Varnum

admitted that she had stopped doing the stretches that Inzerillo had recommended. (*Id.*). Upon

physical examination, Inzerillo opined that Varnum's facet and right SI joint pain were markedly

reduced. (*Id.*). Inzerillo performed aggressive manual soft tissue manipulations to Varnum's

right gluteus maximus and quadratus lumborum, as well as an osteopathic manipulation of her

lumber spine and right sacroiliac joint. (*Id.*). He also demonstrated deep tissue massage and stretching techniques to Varnum's boyfriend to be performed at home. (*Id.*). He emphasized to Varnum the importance of daily stretching. (*Id.*). Again, he noted that he did not believe Varnum had "a good perception of her pain," finding some of her complaints to be unreasonable. (*Id.*). He assessed that she had made "very good" progress with his treatment and that she should continue treatment with a short course of physical therapy. (*Id.*).

### 4.    Eugene A. Tolomeo, MD

Treatment notes indicate that Varnum attended an appointment with Eugene A. Tolomeo ("Tolomeo"), MD, at Ontario Neurology Associates on March 28, 2011. (Tr. 421-29). The purpose of the appointment was to administer nerve conduction studies to assess Varnum's ongoing leg pain. (*Id.*). Varnum reported that she had suffered from pain and tenderness in her legs for several years. (*Id.*). According to Varnum, the pain was slightly worse on her right than her left side and the pain extended the length of her leg from her hips to her feet. (*Id.*). Her pain was primarily centered in her hips, knees and ankles and was exacerbated by standing. (*Id.*). According to Varnum, her legs felt weak and her feet began to tingle with prolonged standing. (*Id.*).

Tolomeo administered nerve conduction studies and an EMG. (*Id.*). The results demonstrated no evidence of nerve injury. (*Id.*). Tolomeo opined that her impairment was likely musculoskeletal in nature and could include tendinitis, arthritis, connective tissue inflammation, or fibromyalgia. (*Id.*). He also assessed that Varnum might suffer from carpal tunnel syndrome. (*Id.*).

Varnum returned on March 31, 2011 for further testing relating to potential carpal tunnel syndrome. (Tr. 419-20). Tolomeo assessed that she suffered from moderate to severe

right carpal tunnel syndrome and mild left carpal tunnel syndrome.  (*Id.*).  He suggested conservative treatment with shin splints, nonsteroidal anti-inflammatories, and cessation of activities that exacerbate her symptoms.  (*Id.*).  He believed that this treatment would address her left carpal tunnel syndrome.  (*Id.*).  With respect to her right carpal tunnel syndrome, he referred her to Dr. Alexander for a release procedure.  (*Id.*).

## 5.   **Brownstone Physical Therapy**

On November 21, 2011, Varnum began physical therapy with Laura Twist ("Twist"), MS, PT, DPT, at Brownstone Physical Therapy.  (Tr. 541).  Treatment notes indicate that Varnum suffered from chronic low back pain and right lower extremity symptoms.  (*Id.*).  Varnum reported difficulty with walking, prolonged standing, activities of daily living, and functional mobility.  (*Id.*).  She reported taking ibuprofen for relief.  (*Id.*).

Upon examination, Twist noted limited range of motion, decreased strength, and limited functional mobility.  (*Id.*).  A neurological examination was benign.  (*Id.*).  Testing revealed a positive slump test, positive straight leg raise, negative stork standing test, and negative SI testing.  (*Id.*).  Twist was able to reproduce pain and muscle spasms upon palpation of myofascial trigger points.  (*Id.*).  She assessed mechanical low back pain with myofascial pain syndrome.  (*Id.*).  She recommended physical therapy one to two times per week for four weeks and a comprehensive home exercise program.  (*Id.*).  She assessed that Varnum's prognosis was poor given the chronicity of her symptoms.  (*Id.*).

Varnum returned for therapy sessions on November 29 and December 7, 2011. (Tr. 542).  She reported that the exercises helped to alleviate her pain while she was performing them, but that her pain returned later in the day.  (*Id.*).  Varnum was discharged from treatment on December 7, 2011.  (Tr. 543).

Varnum returned for additional therapy sessions in February 2012 upon referral from Dr. Alexander.  (Tr. 544-47).  She attended approximately seven appointments prior to her discharge on March 20, 2012.  (*Id.*).  According to the treatment notes, she was discharged because her symptoms of low back pain and lower extremity weakness had waned to the level for which independent exercise was sufficient.  (*Id.*).  The physical therapist recommended daily exercise, including walking, and an ongoing exercise routine that emphasized lower extremity stretching and total flexibility.  (*Id.*).

### 6.  Finger Lakes Bone and Joint Center

On January 23, 2011, Varnum attended an appointment with David Cywinski ("Cywinski"), MD, an orthopedic physician practicing at Finger Lakes Bone and Joint Center. (Tr. 528-29).  According to the treatment notes, Varnum was being evaluated for ongoing low back pain, accompanied by pain, numbness and tingling in the lower legs.  (*Id.*).  Varnum reported to Cywinski that she previously had been treated by Lasser, who had diagnosed her with arthritis.  (*Id.*).  Varnum indicated that she had difficulty standing for any length of time and could not walk far.  (*Id.*).  She was unemployed, but looking for work.  (*Id.*).

Upon examination, Cywinski assessed tenderness upon palpation of the lumber spine with full strength in her lower extremities.  (*Id.*).  Imaging of the lumbar spine revealed degenerative disc disease at L4-L5 and L5-S1.  (Tr. 524, 528).  Cywinski recommended an MRI. (*Id.*).

On February 1, 2012, Varnum returned for an appointment with S. Christopher Springer ("Springer"), NP, and Daniel Alexander ("Alexander"), MD, an orthopedic surgeon. (Tr. 530-31).  According to the treatment notes, an MRI revealed mild degenerative disc changes, most prominent at L4-L5 and L5-S1, and a bulging disc associated with annular tears at

the dorsal disc margin.  (*Id.*).  There was no evidence of herniation, canal stenosis, or neural foraminal stenosis.  (*Id.*).  Varnum continued to complain of pain and discomfort in her lower back and occasional pain in her right leg.  (*Id.*).

A physical examination was essentially normal, with a negative straight leg raise bilaterally and no tenderness upon palpation.  (*Id.*).  She was assessed to suffer from lumbar spine degenerative disc disease.  (*Id.*).  She was prescribed a Medrol dosepak, which she indicated she might not take.  (*Id.*).  She was also given a prescription for physical therapy and, at her request, work restrictions.  (*Id.*).

Varnum returned for a follow-up appointment on February 6, 2012.  (Tr. 532). She continued to complain of lower back pain and had attended one physical therapy appointment, but had not tried the prescribed steroid due to a fear of dizziness.  (*Id.*).  She continued to complain of lower back pain without radiculopathy.  (*Id.*).  A physical examination revealed mild tenderness over the lumbar spine and a negative straight leg raise.  (*Id.*).  She was advised to continue physical therapy and was given updated work restrictions.  (*Id.*).

On March 21, 2012, Varnum returned for another appointment.  (Tr. 533-34). She reported some relief through physical therapy.  (*Id.*).  A physical examination was essentially normal, with the exception of some mild tenderness along the paraspinal musculature upon palpation.  (*Id.*).  She was instructed to continue with her home exercise program and to follow up as needed.  (*Id.*).

On May 17, 2012, Varnum returned for an appointment with Cywinski complaining of a recent injury to her left knee approximately three weeks earlier.  (Tr. 535-36). According to Varnum, she had been in pain since that time.  (*Id.*).  Varnum also continued to suffer from lumbosacral degenerative disc disease and was considering epidural injections.  (*Id.*).

A physical examination of the left knee demonstrated tenderness over the medial joint line and a mildly positive McMurray test. (*Id.*). Imaging of the left knee demonstrated no cortical disruption or trabecular abnormality, although it did suggest mild medial joint space narrowing. (*Id.*). Cywinski administered a cortisone injection to Varnum's left knee and advised her to follow up in approximately six weeks. (*Id.*).

On May 23, 2012, Cywinski administered an epidural injection to Varnum's back. (Tr. 538). Varnum returned on May 30 and June 6, 2012 for additional epidural injections. (Tr. 549, 551).

On June 28, 2012, Varnum attended an appointment with Cywinski for further evaluation of her left knee pain. (Tr. 552). Varnum reported that she felt much better after the injection and was taking ibuprofen as needed. (*Id.*). A physical examination of her left knee was normal, and Cywinski assessed a left knee with internal derangement that had improved with an injection. (*Id.*). He recommended that Varnum follow up as needed. (*Id.*).

Varnum returned on October 16, 2012 for further evaluation of her lower back and right hip pain. (Tr. 553). Varnum reported complete resolution of her symptoms following the epidural injections, but a subsequent return of the pain and discomfort. (*Id.*). Examination of the lower back revealed tenderness to palpation, but excellent motion of her hip. (*Id.*). Imaging of her right hip revealed no abnormality. (*Id.*). Given her response to the epidural injections, Varnum was referred to Dr. Whitbeck for a surgical opinion. (*Id.*).

On March 29, 2013, Varnum attended an appointment with Alexander complaining of recurrent pain in her left knee. (Tr. 755-56). Varnum reported that the relief from the cortisone injection had lasted only a few weeks. (*Id.*). An examination demonstrated exquisite tenderness over the medial joint line of the left knee, a positive McMurray test, and

range of motion from zero to 130 degrees.  (*Id.*).  Imaging of the left knee demonstrated medial

joint space narrowing.  (*Id.*).  Alexander assessed left knee internal derangement with

osteoarthritis.  (*Id.*).  He referred Varnum for an MRI.  (*Id.*).

   Varnum returned on April 9, 2013 to review the results of her MRI.  (Tr. 759).

The MRI revealed a medial meniscus tear with mild degenerative changes.  (*Id.*).  Physical

examination demonstrated exquisite tenderness about the medial joint line of the left knee and a

very positive McMurray test.  (*Id.*).  Alexander recommended range of motion and strengthening

exercises and an anti-inflammatory with meals.  (*Id.*).  Varnum opted for a diagnostic

arthroscopy procedure.  (*Id.*).  The left knee arthroscopy was conducted on April 15, 2013.

(Tr. 678-79).

   On April 23, 2013, Varnum attended a post-operative appointment with

Alexander.  (Tr. 762-63).  She reported some pain and discomfort, but that she was doing much

better and would like to return to work as soon as possible.  (*Id.*).  The incision was well-healed,

and her range of motion was zero to ninety degrees.  (*Id.*).  Her knee was mildly swollen.  (*Id.*).

Alexander recommended physical therapy for four weeks.  (*Id.*).  During a follow-up

appointment on May 21, 2013, Varnum reported that her knee had improved after the

arthroscopy.  (Tr. 765).  Alexander noted good motion and well-healing incisions.  (*Id.*).  He

instructed her to perform activities as tolerated and to follow up as needed.  (*Id.*).

   On May 28, 2013, Varnum attended another appointment with Alexander for

further evaluation of her right hip.  (Tr. 764).  She reported previous epidurals that had provided

relief for only about one week.  (*Id.*).  According to Varnum, her hip became painful after lying

on her side or prolonged walking.  (*Id.*).  Upon examination, Varnum's gait was normal, and she

did not demonstrate pain with resistance to hip flexion.  (*Id.*).  She had "excellent" internal and

external rotation, although she had point tenderness consistent with trochanteric bursitis.  (*Id.*).

Imaging of her hip was unremarkable.  (*Id.*).  Alexander assessed right hip bursitis.  (*Id.*).

Varnum declined an injection and agreed to attend physical therapy.  (*Id.*).  Varnum returned on

June 6, 2013 complaining of continued right hip pain.  (Tr. 766).  Alexander administered a

cortisone injection and recommended that she continue with physical therapy.  (*Id.*).

### 7.     Arif Choudhury, MD[4]

Handwritten treatment notes from 2009 and 2010 suggest that Varnum received

primary care treatment from Arif Choudhury ("Choudhury"), MD, for a variety of impairments.

(Tr. 487-503).  During those visits, Varnum complained of pain in her lower back and thighs.

(*Id.*).  Choudhury noted that she was receiving care from Lasser and Inzerillo relating to these

complaints.  (*Id.*).

On August 4, 2010, Varnum attended an appointment with Choudhury

complaining of right-sided tingling and numbness in her right hand and pain in the back of her

neck.  (Tr. 362).  Choudhury assessed a possible nerve impingement and ordered imaging of the

cervical spine.  (*Id.*).  Varnum returned for a follow-up appointment on September 15, 2010,

complaining of ongoing neck pain.  (Tr. 363).  Choudhury noted that Varnum would see Dr.

Alexander and that imaging showed degenerative joint disease at C5-C6 and C6-C7.  (Tr. 363,

499).

Treatment notes dated March 28, 2011 suggest that Varnum attended an

appointment with Choudhury complaining of leg pain at a level of ten out of ten.  (Tr. 354-55).

According to Varnum, her legs were sometimes immobilized due to pain.  (*Id.*).  Choudhury

---

[4] Portions of these treatment records are handwritten and difficult, if not impossible, to decipher. Accordingly, the Court has summarized only those portions of these records that are legible.

noted that Varnum had been seen by Dr. Alexander for this problem, but that his treatment "didn't help much." (*Id.*).

Varnum returned for an appointment on May 16, 2011. (Tr. 353). The treatment notes suggest that Varnum had undergone testing conducted by Dr. Tolomeo. (*Id.*). Choudhury noted tender spots on both sides of Varnum's upper back. (*Id.*). He assessed fibromyalgia and prescribed Cymbalta. (*Id.*).

On August 15, 2011, Varnum attended an appointment with Choudhury complaining of ongoing chronic low back pain. (Tr. 351). Upon examination, Choudhury observed no edema, weak left-sided tenderness, and a negative straight leg raise test bilaterally. (*Id.*). He noted that Varnum had previously been treated for this condition by Lasser and had been referred to physical therapy and provided a TENS unit. (*Id.*). Choudhury advised Varnum to apply warm compression and to return to physical therapy. (*Id.*).

Varnum returned for an appointment on September 28, 2011 complaining of bilateral groin pain that was exacerbated by prolonged walking and heavy lifting. (Tr. 349). Upon examination, Choudhury noted no tenderness, swelling, or lymphadenopathy in the groin area. (*Id.*). An ultrasonogram was normal. (*Id.*). Choudhury prescribed Celebrex and advised Varnum to refrain from lifting heavy objects. (*Id.*).

On November 14, 2011, Varnum attended an appointment with Choudhury complaining of chronic low back pain that sometimes radiated to her right leg. (Tr. 347). Choudhury noted that Varnum had been evaluated by Dr. Tolomeo, who had performed a nerve conduction study on March 31, 2011, that had revealed no abnormalities. (*Id.*). According to Choudhury, Tolomeo opined that Varnum might suffer from tendinitis, arthritis, connective tissue inflammation, or possibly fibromyalgia. (*Id.*). Upon examination, Choudhury noted no

tenderness, and a straight leg raise test was normal.  (*Id.*).  He recommended that Varnum return to physical therapy and advised her to refrain from lifting more than twenty pounds.  (*Id.*).

Varnum returned for an appointment with Choudhury on December 14, 2011. (Tr. 345).  She reported that her chronic low back pain was mild to moderate and sometimes radiated down her hips and up to her groin.  (*Id.*).  She reported some discomfort with walking after prolonged sitting.  (*Id.*).  According to Varnum, physical therapy was only mildly helpful. (*Id.*).  Upon examination, Varnum was able to perform the heel and toe walk, a straight leg raise test was normal, and Choudhury did not observe any tenderness in the area.  (*Id.*).  He noted that neither ibuprofen or Celebrex had relieved her pain and that she likely suffered from degenerative disc disease.  (*Id.*).  He prescribed Vimovo.  (*Id.*).

On January 17, 2012, Varnum attended another appointment complaining of ongoing lower back pain.  (Tr. 343-44).  She had been seen by Dr. Inzerillo, a chiropractor, and by Lasser and Tolomeo, a neurologist.  (*Id.*).  Again, Choudhury observed no tenderness of the lumbar spine, and a straight leg raise test was normal.  (*Id.*).  According to Choudhury, previous studies suggested degenerative changes at L4-L5 and L5-S1 with annular tears at the bottom of each of three discs.  (*Id.*).  He noted that she was planning to see Dr. Alexander the following day for further evaluation.  (*Id.*).  Varnum returned on March 20, 2012, reporting that her back pain had improved with the warmer weather.  (Tr. 467).

Varnum returned for another appointment with Choudhury on May 11, 2012, complaining of left knee pain.  (Tr. 563-64).  According to Varnum, the pain was approximately two or three out of ten, but was worse when she walked.  (*Id.*).  Choudhury observed mild tenderness of the left knee, with no swelling or erythema, and a normal active range of motion. (*Id.*).  Choudhury assessed a medial meniscus injury, anserine bursitis, and advised her to take

Tylenol when necessary and to see Dr. Alexander for further evaluation and a possible corticosteroid injection.  (*Id.*).

On June 19, 2012, Varnum attended another appointment complaining of swelling in her right ankle.  (Tr. 570-71).  Choudhury noted mild swelling with no tenderness.  (*Id.*).  He advised Varnum to follow a low salt diet.  (*Id.*).  Choudhury noted that Varnum had received injections in her left knee and low back from Dr. Alexander with little improvement.  (*Id.*).  He advised her to avoid lifting heavy objects.  (*Id.*).

Varnum attended several appointments with Choudhury between June 26, 2012 and November 20, 2012 complaining of a variety of ailments.  (Tr. 577-603).  During several of those visits, Varnum expressed her frustration and stress stemming from her inability to find employment.  (*Id.*).  During her November 20, 2012 appointment, Varnum complained of feeling off balance.  (Tr. 603-04).  Choudhury opined that it was unlikely that she suffered from gait instability because she appeared "very comfortable and [was] walking good."  (*Id.*).  He assessed that her symptoms were "mild" and "vague" and that she may suffer from underlying depression. (*Id.*).  He noted that she was taking Evista and calcium with Vitamin D to address her osteoporosis.  (*Id.*).

On January 29, 2013, Varnum attended an appointment with Choudhury during which she complained of generalized body aches, for which she took ibuprofen.  (Tr. 625-26).  Varnum reported that she continued to look for employment and felt sad, but did not want any medication to address her mood.  (*Id.*).

Varnum returned for an appointment with Choudhury on May 23, 2013. (Tr. 778-79).  During the appointment she complained of heart palpitations at night.  (*Id.*).  She reported that she was working part-time and that her inability to work full-time caused her stress.

16

(*Id.*).  She reported that she continued to suffer from chronic low back pain that worsened with prolonged standing or walking.  (*Id.*).

### 8.    Christina Taddeo, MD

On January 7, 2013, Varnum attended an appointment with Christina E. Taddeo ("Taddeo"), MD, for an electrodiagnostic evaluation of her right lower limb.  (Tr. 555-57). Taddeo reported that Varnum suffered from degenerative disc disease and spondylosis of the lumbar spine and that she complained of more right than left hip and leg problems.  (*Id.*). According to Varnum, she experienced numbness spreading down her right lateral thigh, lateral calf, and into her right foot.  (*Id.*).  She reported that the numbness first began when she was a teenager and that she now experiences weakness in her legs and can have difficulty rising from a seated position.  (*Id.*).  She reported similar but less severe symptoms in her left leg.  (*Id.*).

Upon examination, Varnum demonstrated functional range of motion in both legs, with intact strength in her left leg and 4/5 strength in her right leg.  (*Id.*).  Varnum's light touch sensation was diminished in her right lateral thigh, calf, and foot.  (*Id.*).  Her reflexes were normal.  (*Id.*).  Taddeo administered a nerve conduction study of Varnum's bilateral lower limbs. (*Id.*).  The results suggested mild right L-5 radiculopathy with residual impairment of the EDB muscle.  (*Id.*).  Taddeo was unable to rule out a fibular neuropathy between the innervation of the extensor hallucis longus and extensor digitorum brevis muscles, although that diagnosis would not explain Varnum's complaints of paresthesias in her leg.  (*Id.*).  Taddeo compared her findings to the results obtained by Tolomeo in March 2011 and noted her additional findings. (*Id.*).  She noted that her new findings might warrant repeat diagnostics in approximately four months to evaluate for any changes or progressions in Varnum's nerve functioning.  (*Id.*).

9.      **Pain Interventions**

In connection with her appeal of the ALJ's decision, Varnum submitted additional evidence relating to treatment she received at Pain Interventions in March 2014.  (Tr. 77-79, 82-84).  On March 5, 2014, Varnum attended a new patient visit complaining of chronic back pain.  (Tr. 82-83).  She reported that the pain was made worse by both too little and too much activity.  (*Id.*).  She denied any radicular complaints and reported unsuccessful previous attempts at physical therapy and epidural steroid injections.  (*Id.*).  Anthony Inzana ("Inzana"), PA, reported that diagnostic imaging demonstrated degenerative disc disease, but no significant stenosis.  (*Id.*).  Varnum was interested in discussing options for pain management and conservative treatments.  (*Id.*).

Upon examination, Inzana noted that Varnum appeared to be in moderate pain, but was able to ambulate without any assistive device.  (*Id.*).  She demonstrated normal range of motion in her right and left hips with no tenderness, swelling, ecchymosis, erythema or crepitus.  (*Id.*).  She demonstrated tenderness and moderate pain in her lower back at rest and with movement.  (*Id.*).  She had normal range of motion in her back, and a straight leg raise test was negative.  (*Id.*).  She was tender in the L4-5 and L5-S1 facets.  (*Id.*).  She also demonstrated normal strength and reflexes in her extremities.  (*Id.*).  Inzana assessed degeneration of the lumbar or lumbosacral intervertebral disc and lumbago.  (*Id.*).  He recommended a series of facet joint injections.  (*Id.*).  The injections were administered on March 17 and April 30, 2014.  (Tr. 77-78).

Varnum attended a follow-up appointment with Inzana on May 30, 2014.  (Tr. 79).  During the appointment, she reported some relief from the injections.  (*Id.*).  Inzana noted that the injections had provided good but temporary relief and suggested that she undergo

an RFN of the medial branches at L4, L5 and S1 bilaterally.  (*Id.*).  Varnum agreed to the

procedure.  (*Id.*).

    **B.**    **Medical Opinion Evidence**

        **1.**    **Harbinder Toor, MD**

On April 17, 2012, state examiner Harbinder Toor ("Toor"), MD, conducted a

consultative internal medicine examination of Varnum.  (Tr. 513-16).  Varnum reported that she

suffered from chronic lower back pain due to disc disease in her lumbar spine.  (*Id.*).  She

complained of constant, sharp pain, sometimes at a level ten.  (*Id.*).  According to Varnum, the

pain radiated to her legs, sometimes causing tingling, numbness, and pain that was more

pronounced in the right leg.  (*Id.*).  She reported difficulty standing, sitting, and walking for

prolonged periods, as well as difficulty bending and lifting.  (*Id.*).  Varnum also complained of

dull, achy, intermittent pain in her cervical spine that sometimes radiated to her shoulders and

arms causing tingling and numbness in her hands.  (*Id.*).  She reported difficulty twisting,

bending, and extending her cervical spine, as well as difficult grasping, holding, and reaching.

(*Id.*).

Varnum reported that she cooks three days a week, cleans twice a week and does

the laundry and shopping once a week.  (*Id.*).  She reported that she is able to shower or bathe

five times a week and dress every day and that she watches television, listens to the radio, reads,

and leaves the house.  (*Id.*).  She does not socialize or participate in sports or hobbies.  (*Id.*).

Upon examination, Toor noted that Varnum did not appear to be in acute distress,

had a normal gait and stance, used no assistive devices, and did not need assistance changing for

the exam.  (*Id.*).  He reported that she appeared to have difficulty getting out of the chair and that

she refused to lie down on the examination table due to pain in her back.  (*Id.*).  She was able to complete the heel to toe walking with difficulty and could squat to fifty percent of full.  (*Id.*).

Toor noted that Varnum's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally, and he noted slight tenderness in the cervical spine.  (*Id.*).  Toor identified no scoliosis, kyphosis, or other abnormality in the thoracic spine.  (*Id.*).  Toor found that Varnum's lumbar forward flexion was limited to twenty degrees, extension was zero degrees, lateral flexion and rotation were thirty degrees.  (*Id.*).  Varnum refused to perform the straight leg raise in either the sitting or supine positions.  (*Id.*).  She demonstrated full range of motion in the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally.  (*Id.*).  She demonstrated no sensory deficits in her extremities, and her strength was intact.  (*Id.*).  Additionally, Toor found her hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally.  (*Id.*).

Toor diagnosed Varnum with a history of chronic lower back pain and intermittent pain in her cervical spine, with some tingling and numbness in her hands.  (*Id.*).  He opined that Varnum had "moderate limitations in standing, walking, and sitting a long time." (*Id.*).  He also opined that Varnum had moderate to severe limitations in bending and heavy lifting, and mild limitations in twisting of the cervical spine.  (*Id.*).  He noted that pain interferes with Varnum's physical routine, but that her prognosis was fair and that there were no other limitations suggested by his examination.  (*Id.*).

### 2.   <u>Choudhury</u>

On July 18, 2013, Choudhury completed a Physical Residual Functional Capacity ("RFC") Questionnaire.  (Tr. 769-72).  Choudhury opined that Varnum suffered from chronic lower back pain with a fair prognosis.  (*Id.*).  According to Choudhury, Varnum had reported that

the pain radiates down both of her legs and that she had received treatment from Lasser and

Alexander relating to this issue.  (*Id.*).  He noted that her pain prevented her from working at full

capacity and that she had work restrictions imposed by Alexander, her orthopedist.  (*Id.*).

According to Choudhury, Varnum's symptoms would be aggravated by prolonged standing,

walking or lifting heavy objects and that her pain would frequently interfere with her ability to

maintain the attention and concentration necessary to perform simple tasks.  (*Id.*).

       Choudhury opined that Varnum could walk approximately one to two blocks at a

time, could stand for approximately thirty minutes at a time, and could sit for more than two

hours at a time.  (*Id.*).  In response to another question, Choudhury opined that Varnum was able

to sit, stand or walk approximately two hours total during a workday, although his response did

not indicate whether the limitation applied only to standing and walking, or to standing, walking

or sitting.[5]  (*Id.*).  Choudhury also noted that Varnum would need to be able to shift from sitting

to standing at will, and to take some unscheduled breaks during the workday.  (*Id.*).  He also

opined that Varnum could frequently lift objects weighing up to ten pounds, could occasionally

lift objects weighing up to twenty pounds, and could never lift objects weighing fifty pounds.

(*Id.*).  She was able to occasionally climb ladders and stairs and could rarely twist or bend.  (*Id.*).

According to Choudhury, Varnum did not have significant limitations with reaching, handling,

or fingering, but was likely to suffer from good days and bad days.  (*Id.*).  Choudhury opined that

Varnum was likely to be absent more than four days per month because she would need to rest if

she aggravated her back pain.  (*Id.*).  He opined that she was unable to sustain full-time

employment.  (*Id.*).  Choudhury noted that Varnum's back pain was treated by Alexander, an

orthopedic, whose input was more important than Choudhury's.  (*Id.*).

---

[5] Of course, if Choudhury's response is read to include sitting, it would be inconsistent with his previous
response that Varnum could sit for longer than two hours at a time.  (*Compare* Tr. 770 *with* Tr. 771).

**III.**     **Non-Medical Evidence**

   In her application for benefits, Varnum reported that she was born in 1967.

(Tr. 230).  According to Varnum, she obtained her GED in 2012 and had previously worked as a

factory laborer.  (Tr. 235).  She reported that she had suffered from back pain since

approximately 2003 and took ibuprofen to manage her pain.  (Tr. 244-45).  She reported that she

was able to walk, shop, complete household chores, drive, and socialize and that she has a young

granddaughter who "needs her."  (Tr. 246).  She reported that she avoids constantly getting up

and down, and has difficultly standing, walking, and bending.  (*Id.*).

   During the administrative hearing, Varnum testified that she lived with her

daughter and granddaughter.  (Tr. 31).  She reported that she had previously worked as an

injection mold machine operator, a tool parts finisher, and a binder sewing seat covers.

(Tr. 35-39).  Varnum testified that she was currently working part-time as a receptionist through

a program called Experience Works, which assists people over fifty-five to learn skills to obtain

employment.  (Tr. 33).  Varnum worked five days a week for four hours each day without

breaks.  (Tr. 34-35, 55).  She testified that she experienced difficulty sitting in her chair and

sometimes had to move around.  (Tr. 51).  She also had difficulty with the computer mouse due

to arthritis or carpal tunnel in her arms.  (*Id.*).  She had been working there for approximately six

months at the time of the hearing and had taken time off from work for doctor's appointments

and due to a respiratory infection.  (Tr. 35, 55-56).  She was currently looking for other

employment and testified that she would take any part-time job that was offered to her.  (Tr. 34).

   Varnum testified that she was unable to perform her previous positions due to

difficulty standing and walking.  (Tr. 43).  According to Varnum, when she performs household

yardwork, her back gets very stiff and her legs and hip hurt.  (*Id.*).  Varnum testified that she

experiences constant back pain at varying degrees of intensity, which she treats with ibuprofen and a heating pad.  (Tr. 44).  She previously attempted physical therapy and epidural injections without relief.  (Tr. 44-45, 47).  She also testified that she had surgery performed on her left knee, but that her knee still felt unstable.  (Tr. 45).

According to Varnum, her pain is aggravated by prolonged sitting and walking. (Tr. 48).  She estimated that she is able to sit for approximately twenty minutes before needing to get up and walk around, to stand for approximately ten minutes at a time, and walk approximately two blocks before needing to rest.  (*Id.*).  She also testified that she has difficulty with heavy lifting or quick movements due to pain in her upper back.  (Tr. 49).  According to Varnum, some days she needs to lie down or elevate her legs in order to relieve her pain. (Tr. 49-50).  She testified that she is able to drive, but that extending her leg on the gas pedal for prolonged periods bothers her knee and leg.  (Tr. 50).  She also experiences pain in her wrists and hands when using her hands for prolonged periods.  (Tr. 52).  She also reported difficulty sleeping.  (*Id.*).

Varnum testified that she is able to complete approximately four to five hours of housework at a time, including vacuuming, laundry, dishes, and yardwork, including mowing and trimming the hedges.  (Tr. 53-54).  According to Varnum, she completes this level of housework and yardwork "a couple [of] times a week," but is often "sore and in pain" at night. (Tr. 54).  She also testified that she sometimes needs to take breaks when completing her chores. (Tr. 55).

A vocational expert, Peter Manzi ("Manzi"), also testified during the hearing. (Tr. 57-65, 185).  The ALJ first asked Manzi to characterize Varnum's previous employment. (Tr. 57).  According to Manzi, Varnum had previously been employed as a binder.  (Tr. 57-59).

The ALJ then asked Manzi whether a person would be able to perform any of Varnum's previous jobs if she were of the same age, had the same education and vocational profile, and could perform work at the light exertional level, including occasionally lifting and carrying up to twenty pounds, frequently lifting and carrying up to ten pounds, and could sit, stand or walk for approximately six hours of an eight-hour day. (Tr. 60). In addition, the individual must be permitted to alternate positions every thirty minutes and could occasionally push or pull up to twenty pounds and climb ramps or stairs, balance, stoop, kneel, crouch and crawl, frequently look up and down, turn their head to the left and right, reach, handle, finger, and manipulate foot controls, but could never climb ladders ropes or scaffolds. (Tr. 60-61). Manzi testified that such an individual could perform Varnum's previous position of binder. (Tr. 61).

Varnum's attorney asked Manzi whether an individual with the same limitations identified by the ALJ, but who was limited to only occasional use of foot controls bilaterally would be able to perform the binder position. (Tr. 62). Manzi testified that such an individual would be unable to perform the positions. (*Id.*). Similarly, Varnum's attorney asked Manzi whether an individual with the limitations identified by the ALJ, but who was limited to only occasional reaching, handling or fingering would be able to perform the position of binder. (*Id.*). Again, Manzi testified that such an individual would be unable to perform that position. (*Id.*). Next, Varnum's attorney asked Manzi if an individual with the same limitations as identified by the ALJ, but who needed to leave the work station for ten minutes every forty-five minutes in order to walk would be able to maintain employment as a binder. (*Id.*). Manzi testified that such an individual would be unable to maintain such employment. (*Id.*). Finally, in response to

questioning by Varnum's attorney, Manzi stated that an individual would be permitted to miss no more than two days per month in order to maintain employment.  (Tr. 63).

## DISCUSSION

## I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five-steps are:

(1)     whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

> (5)     if not, whether the claimant retains the residual functional
> capacity to perform any other work that exists in significant
> numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"   *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.     The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 12-21).  Under step one of the process, the ALJ found that Varnum has

not engaged in substantial gainful activity since January 31, 2011, the alleged onset date.

(Tr. 12).  At step two, the ALJ concluded that Varnum has the severe impairments of lumbar and

cervical degenerative disc disease, lumbar spondylosis, right carpal tunnel syndrome, and left

knee internal derangement.  (*Id.*).  The ALJ concluded that Varnum's other impairments,

including microadenoma of the pituitary gland, fibromyalgia, and anxiety, are not severe.

(Tr. 13-14).  At step three, the ALJ determined that Varnum does not have an impairment (or

combination of impairments) that meets or medically equals one of the listed impairments.

(Tr. 14).  The ALJ concluded that Varnum has the RFC to perform less than the full range of

light work and could lift, carry, push, and pull up to twenty pounds occasionally and up to ten

pounds frequently, and sit, stand or walk up to six hours in an eight-hour workday.  (Tr. 14-15).

Additionally, the ALJ determined that Varnum could never climb ladders, ropes or scaffolds, and

was limited to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching,

and crawling, and could frequently look up or down and turn her head left to right, operate foot

controls, reach, handle, and finger.  (*Id.*).  The ALJ also determined that Varnum must be

permitted to sit or stand for one to two minute intervals after sitting or standing for thirty minute

intervals.  (*Id.*).  At step four, the ALJ determined that Varnum is able to perform her prior work

as a binder.  (Tr. 21).  Accordingly, the ALJ found that Varnum is not disabled.  (*Id.*).

       **B.**     **Varnum's Contentions**

       Varnum contends that the ALJ's determination that she is not disabled is not

supported by substantial evidence.  (Docket # 10-1).  First, Varnum contends that the ALJ's

physical RFC assessment is not based upon substantial evidence because he improperly rejected

Choudhury's opinion without articulating sufficient reasons for doing so.  (*Id.* at 12-17).  Further,

Varnum contends that Toor's opinion was too vague to constitute substantial evidence to support

the ALJ's assessment.  (*Id.* at 17-19).  Varnum maintains that because Toor's opinion is

impermissibly vague, the ALJ's RFC is not supported by any medical opinion of Varnum's

functional capacities and thus lacks substantial evidence.  (*Id.*).


**II.**     **Analysis**

       An individual's RFC is his "maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis."  *Melville v. Apfel,* 198

F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When

making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental

abilities, symptomology, including pain and other limitations which could interfere with work

activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221

(N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider

all the relevant evidence, including medical opinions and facts, physical and mental abilities,

non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*,

2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370

F. App'x 231 (2d Cir. 2010).

I turn first to Varnum's contentions that the ALJ erred by failing to accord

Choudhury's opinion controlling weight.  Generally, a treating physician's opinion is entitled to

"controlling weight" when it is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record."  20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197,

199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating

physician so long as it is consistent with the other substantial evidence").  "An ALJ who refuses

to accord controlling weight to the medical opinion of a treating physician must consider various

'factors' to determine how much weight to give to the opinion."  *Halloran v. Barnhart*, 362 F.3d

28, 32 (2d Cir. 2004).  The ALJ must consider:

(1)     the frequency of examination and length, nature, and extent
of the treatment relationship,

(2)     the evidence in support of the physician's opinion,

(3)     the consistency of the opinion with the record as a whole,

(4)     whether the opinion is from a specialist, and

(5)     whatever other factors tend to support or contradict the
opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ

should "give good reasons in [his] notice of determination or decision for the weight [he] give[s]

[claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at 32 (alterations in

original) (quoting 20 C.F.R. § 404.1527(c)(2)).

I conclude that the ALJ provided "good reasons" for his decision to assign limited weight to Choudhury's opinions.  In his decision, the ALJ accorded Choudhury's opinions "little weight" because he found that they were inconsistent with Varnum's current work history, her testimony regarding her activities of daily living, and Choudhury's own treatment notes, which documented "minimal objective findings" and "treatment recommendations inconsistent with disabling impairments."  (Tr. 17-18).  Specifically, the ALJ noted that the limitations assessed by Choudhury were inconsistent with Varnum's work history, including her current employment. (*Id.*).  During the hearing, Varnum testified that she had been employed in a part-time position for approximately six months.  Varnum's employment required her to sit at a receptionist desk to answer telephones and work on a computer for four hours each day, five days per week, without any breaks.

The record does not suggest that Varnum's medical impairments precluded or inhibited her ability to complete the physical or attendance-related requirements of her employment on a daily basis.  Indeed, Varnum did not testify to any significant difficulty completing her four-hour workday without any breaks.  Further, although she testified to missing some work due to a respiratory infection and doctor's appointments, Varnum did not testify to any recurrent absences due to aggravation of her lower back pain.  Again, this is inconsistent with Choudhury's opinion that Varnum would likely be absent more than four days per month due to back-related pain.

Similarly, the ALJ concluded that Choudhury's opinion assessing significant physical limitations was inconsistent with Varnum's testimony regarding her activities of daily living.  (Tr. 18).  Specifically, the ALJ noted that Varnum testified to being able to prepare meals, clean, shop, and do laundry on a weekly basis.  (Tr. 20).  According to the ALJ, Varnum

30

reported that she could drive from store to store, spend time on the computer at home and at work, perform housework, including vacuuming, laundry, washing dishes, mowing the lawn and trimming the bushes for up to five hours at a time.  (Tr. 16).  These activities are inconsistent with Choudhury's opinion that Varnum is unable to stand or walk more than two hours per workday.  Further, insofar as Varnum suggests that the ALJ was not permitted to consider her daily activities, including her current employment, in formulating her RFC (Docket # 10-1 at 16-17), she is incorrect.  *See Durante v. Colvin*, 2014 WL 4843684, *2 (D. Conn. 2014) (ALJ properly discussed plaintiff's activities of daily living when formulating RFC; "[w]hile that court's admonition as to the ill wisdom of relying thoughtlessly on evidence of a claimant's ability to manage activities of daily living . . . for the purpose of discrediting evidence of more serious-seeming RFC restrictions in the work context is well-taken, the ALJ does not appear to have erred in this way here"); *Prue v. Comm'r of Soc. Sec.*, 2014 WL 37669, *10 (D. Vt. 2014) ("[i]t was proper for the ALJ to consider [plaintiff's] daily activities in determining her RFC"); *Bonville v. Colvin*, 2013 WL 3745882, *5 (N.D.N.Y. 2013) ("[c]ontrary to [plaintiff's] arguments, the ALJ properly considered her activities of daily living . . . , as well as [plaintiff's] testimony that she could work part-time, and evidence that she declared that she was ready, willing, and able to work during the time period for which she claims disability benefits"); *DiMartino v. Astrue*, 2009 WL 1652167, *3 (W.D.N.Y. 2009) ("[t]he ALJ also properly considered [p]laintiff's daily activities – including his part-time employment – in . . . determining his RFC").

Finally, the ALJ determined that the limitations assessed by Choudhury were not supported by Varnum's medical records, which demonstrated minimal objective findings, or by Varnum's treatment recommendations, which recommended essentially conservative treatment.

(Tr. 17-18).  Specifically, with respect to Varnum's back pain, the ALJ noted that repeated

imaging demonstrated essentially mild degenerative changes in her lumbar spine and, at most,

moderate degeneration in her cervical spine.  (Tr. 18-19).  Similarly, Varnum's medical

providers repeatedly assessed minimal objective findings upon physical examinations and

repeatedly recommended conservative treatment, including physical therapy, injections, and

non-narcotic pain relief.  (*Id.*).  According to the ALJ, physical therapy notes indicated that by

March 2012 Varnum's back pain had "essentially waned to a level where independent exercise is

sufficient." (Tr. 19).  Further, he noted that by June 2012 Varnum was managing her pain with

ibuprofen.  (*Id.*).  According to the ALJ, subsequent treatment records continued to demonstrate

mild degeneration, normal range of motion, and limited musculoskeletal complaints.  (*Id.*).

Although the ALJ recognized that Varnum suffered from a tear in her left knee requiring surgery,

he noted that surgical intervention appeared successful, and that Varnum required limited

post-surgery treatment for her knee.  (*Id.*).

I disagree with Varnum to the extent she contends that the ALJ's determination

that the medical record did not support the limitations assessed by Choudhury was a "boilerplate

statement" that is "impervious to review."  (Docket # 10-1 at 17).  Rather, the ALJ's decision

demonstrates that the ALJ carefully reviewed Varnum's longitudinal medical record and

explained at length his determination that the significant limitations assessed by Choudhury were

not supported by the objective findings documented in the record.  Accordingly, I conclude that

the ALJ did not violate the treating physician rule by according "little weight" to Choudhury's

opinions for the reasons she explained.  *See Harrington v. Colvin*, 2015 WL 790756, *16

(W.D.N.Y. 2015) (ALJ properly discounted treating physician opinion where it assessed

limitations that were inconsistent with findings contained in the treatment records and with

admissions claimant had made concerning his activities of daily living); *Wilferth v. Colvin*, 49 F. Supp. 3d 359, 362 (W.D.N.Y. 2014) (ALJ properly weighed treating physician opinion and "adequately explained her reasons for declining to grant controlling weight to his conclusion" where opinion was "inconsistent with other opinions in the record, as well as statements made by the plaintiff himself, and none of the objective test records . . . indicate[d] a level of disability greater than that reflected in the plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*, 2008 WL 4411655, *5 (N.D.N.Y. 2008) (ALJ properly discounted opinion of treating physician where it was inconsistent with treatment records and objective findings of the consultative examiner).

Next, Varnum argues that the ALJ's rejection of Choudhury's opinion rendered his RFC determination unsupported by any medical opinion of record. (Docket ## 10-1 at 17-19; 14 at 1-5). According to Varnum, Toor's opinion assessing "moderate" limitations for prolonged sitting, walking, standing, bending, and heavy lifting and "mild" limitations for twisting is simply too vague to support the ALJ's RFC assessment. (*Id.*).

As an initial matter, although an expert opinion may describe a claimant's impairments in terms that are so vague as to render the opinion useless, *see Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), the use of imprecise phrases by a consultative examiner does not automatically render an opinion impermissibly vague. *See Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014) (collecting cases). Instead, when a consulting opinion is otherwise supported by clinical findings, an examination of the claimant, or other objective evidence in the record, the opinion "can serve as an adequate basis for the ALJ's ultimate conclusion." *Dier v. Colvin*, 2014 WL 2931400, *4 (W.D.N.Y. 2014) (internal quotation omitted).

In this case, Toor provided an assessment after conducting a thorough examination of Varnum.  During the examination, Toor noted that Varnum did not appear to be in acute distress, was able to heel and toe walk with difficulty, squat halfway, had a normal stance, a normal gait, had full flexion, extension, lateral flexion, and full rotary movement in her cervical spine, with some tenderness and some flexion and range of motion limitations in her lumbar spine.  (Tr. 514-15).  Based upon these findings, Toor assessed that Varnum would have moderate limitations for prolonged sitting, standing, and walking, and moderate to severe limitations for bending and heavy lifting.

Toor's assessment of these limitations is supported by other objective evidence in the record, including Varnum's substantial activities of daily living, which included working part-time, driving, shopping, cleaning, cooking, laundry, mowing the lawn, and trimming the hedges.  It is also supported by the relatively minimal objective medical findings contained in the record, including imaging that demonstrated largely mild degenerative changes and minimal abnormal physical examination findings.  It is further supported by the relatively conservative treatment recommended to Varnum, which consisted primarily of physical therapy, exercise and non-narcotic, over-the-counter medications to manage pain.  In sum, Toor's opinion as to Varnum's limitations was well-supported by his physical examination and other objective medical evidence in the record, and I conclude that the ALJ properly relied upon Toor's opinion to support his RFC assessment.  *See Collier v. Colvin*, 2016 WL 4400313, *3 (W.D.N.Y. 2016) (consulting physician's assessment of "moderate" limitations "was not so vague as to render it useless in evaluating [plaintiff's] ability to perform light work" where it was supported by "an objective physical examination" of the plaintiff") (internal quotations omitted); *Hanson v. Comm'r of Soc. Sec.*, 2016 WL 3960486, *8-9 (N.D.N.Y.) ("[a]lthough a consultative

examiner's opinion may use terminology that, on its face, is vague, such language does not render the consultative examiner's opinion useless in all situations[;] . . . [h]ere, [the consultative examiner's] opinion was not impermissibly vague because he made specific findings on his physical examination and his limitation was supported by other objective evidence in the record") (collecting cases), *report and recommendation adopted*, 2016 WL 3951150 (N.D.N.Y. 2016); *Johnson v. Colvin*, 2015 WL 1300017, *12 (W.D.N.Y. 2015) (ALJ properly relied upon consultative opinion assessing "some limitations" where opinion was supported by physician's physical examination); *Hoffman v. Comm'r of Soc. Sec.*, 2014 WL 6610059, *4 (N.D.N.Y. 2014) (consultative opinion not impermissibly vague where it was "well supported by [the physician's] extensive examination[,] . . . [was] not in any way conclusory [and] . . . was also consistent with the other evidence in the record").

Although Varnum generally challenges the ALJ's RFC assessment and his rejection of Choudhury's more limiting opinion, she does not identify any specific limitation that the ALJ failed to account for, nor does she contend that any particular limitation assessed by the ALJ is otherwise unsupported by the evidence contained in the record. Rather, she challenges the RFC assessment on the grounds that it is not supported by a medical opinion of record.

In this case, the ALJ concluded that Varnum retains the ability to perform the exertional requirements of light work with some additional modifications. (Tr. 14-15). In general, light work requires the ability to lift up to twenty pounds occasionally, lift ten pounds frequently, stand and walk for up to six hours a day, and sit for up to two hours. *See Mancuso v. Astrue*, 361 F. App'x 176, 178 (2d Cir. 2010). I conclude that the ALJ's determination that Varnum was capable of performing light work so long as she was provided the ability to

alternate positions and accommodation of her other postural and reaching limitations was
well-supported by Toor's opinion and the other evidence contained in the record.

As an initial matter, "several courts have upheld an ALJ's decision that the
claimant could perform light or sedentary work even when there is evidence that the claimant
had moderate difficulties in prolonged sitting or standing." *Carroll v. Colvin*, 2014 WL 2945797
at *4; *Harrington v. Colvin*, 2015 WL 790756, *14 (W.D.N.Y. 2015) ("other courts do not
consider an opinion assessing moderate limitations for sitting, standing and walking inconsistent
with a determination that the claimant can perform requirements of light or medium work")
(collecting cases).  In this case, Varnum's ability to sit, stand, or walk for up to six hours per day
is supported by other substantial evidence in the record, and the ALJ provided reasons "tending
to support the finding that, despite the moderate limitations[,] . . . [plaintiff] could still perform
light work." *Carroll v. Colvin*, 2014 WL 2945797 at *4; *see Collier v. Colvin*, 2016 WL
4400313 at *3 (consultative opinion that plaintiff was moderately limited in standing and
walking supported ALJ's RFC assessment that plaintiff could perform light work where ALJ's
decision summarized the medical evidence and explained how that evidence demonstrated that
plaintiff could work despite those limitations).  As explained at length above, the ALJ supported
his assessment of Varnum's RFC with an extensive discussion of her activities of daily living,
part-time employment, and her medical records demonstrating minimal objective findings,
conservative pain management treatment and general improvement of symptoms through
physical therapy and exercise.  Accordingly, I conclude that the ALJ's RFC assessment was
well-supported by the record.

In her reply papers, Varnum asks the Court to disregard its previous decision in
*Harrington v. Colvin*, 2015 WL 790756 (W.D.N.Y. 2015), and the cases cited therein, on the

grounds that a vague consultative opinion cannot support an ALJ's RFC determination where it conflicts with an opinion from a treating source.  (Docket # 14 at 1-5).  The law does not support Varnum's contention.  As an initial matter, the case relied upon by Varnum, *Balsamo v. Chater*, 142 F.3d 75 (2d Cir. 1998), is inapposite.  In *Balsamo*, the ALJ rejected the treating physician's opinion and formulated an RFC without the assistance of any other medical opinion contained in the record.  *Id.* at 80-81.  Unlike this case, the ALJ in *Balsamo* did not rely upon the only consultative opinion in the record, which itself did not assess the claimant's ability to sit, walk, and stand throughout the workday.  *Id.* at 78-79.

In this case, as discussed above, I find that the ALJ did not improperly discount the treating physician's opinion where it was inconsistent with Varnum's current employment, activities of daily living, and medical record as a whole.  The ALJ formulated the RFC by relying upon the opinion provided by Toor, which was well-supported by his physical examination and other objective evidence contained in the record, along with the ALJ's careful review of the medical record and Varnum's testimony.  Although Varnum argues that Toor's opinion was too imprecise to support the ALJ's RFC determination, I disagree for the reasons stated above, and I find no legal error in the ALJ's RFC assessment.  *See Hanson v. Comm'r of Soc. Sec.*, 2016 WL 3960486 at *9 (ALJ properly discounted opinion from treating physician and relied upon consultative opinion that plaintiff had "moderate" lifting limitations; "[t]his is not a case of the ALJ impermissibly interpreting raw medical data and substituting his own lay opinion for that of a medical source[;] [h]ere, the ALJ properly resolved conflicts in the medical record"); *Harrington*, 2015 WL 790756 at *16-17 (ALJ properly discounted treating physician opinion and the ALJ's RFC determination was supported by the consultative opinion assessing moderate limitations for sitting, standing, and walking, and the record as a whole).

In conclusion, I find that the ALJ's RFC assessment was supported by substantial evidence.  The record reflects that although Varnum has sought treatment for her back, hip and knee pain, the physicians who treated Varnum for these impairments repeatedly identified minimal objective findings and generally recommended relief through physical therapy, at-home exercises, and over-the-counter pain management medication.  Despite her complaints of debilitating pain, Varnum's testimony demonstrates that she is able to work part-time five days a week and complete significant household chores for up to five hours a day.  The ALJ's RFC accounted for Varnum's physical impairments by limiting her to less than the full range of light work with a sit/stand accommodation and other postural, handling, and reaching limitations.  Thus, the ALJ's RFC assessment was reasonable and supported by substantial evidence.  *Pellam v. Astrue*, 508 F. App'x 87, 91 (2d Cir. 2013) ("[u]pon our independent review of the existing record, including [the consultative examiner's opinion] and the treatment notes from [plaintiff's] doctors, we conclude that the ALJ's residual functional capacity determination was supported by substantial evidence").

## CONCLUSION

This Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the

pleadings (**Docket # 12**) is **GRANTED**.  Varnum's motion for judgment on the pleadings

(**Docket # 10**) is **DENIED**, and Varnum's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                                    *s/Marian W. Payson*
                                                 MARIAN W. PAYSON
                                                 United States Magistrate Judge

Dated:  Rochester, New York
        September 1, 2016